## COOPER *v.* OKLAHOMA

No. 95–5207.   Argued January 17, 1996—Decided April 16, 1996

STEVENS, J., delivered the opinion for a unanimous Court.

*Robert A. Ravitz* argued the cause and filed briefs for petitioner.

*W. A. Drew Edmondson,* Attorney General of Oklahoma, argued the cause for respondent. With him on the brief was *Sandra D. Howard,* Assistant Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Association on Mental Retardation et al. by *James W. Ellis* and *Barbara E. Bergman;* and for the National Association of Criminal Defense Lawyers by *Charles D. Weisselberg, Dennis E. Curtis, Denise Meyer,* and *Larry J. Fleming.*

A brief of *amicus curiae* urging affirmance was filed for the State of Utah et al. by *Jan Graham,* Attorney General of Utah, *J. Kevin Murphy,*

JUSTICE STEVENS delivered the opinion of the Court.

In Oklahoma the defendant in a criminal prosecution is presumed to be competent to stand trial unless he proves his incompetence by clear and convincing evidence. Okla. Stat., Tit. 22, § 1175.4(B) (1991). Under that standard a defendant may be put to trial even though it is more likely than not that he is incompetent. The question we address in this case is whether the application of that standard to petitioner violated his right to due process under the Fourteenth Amendment.

I

In 1989 petitioner was charged with the brutal killing of an 86-year-old man in the course of a burglary. After an Oklahoma jury found him guilty of first-degree murder and recommended punishment by death, the trial court imposed the death penalty. The Oklahoma Court of Criminal Appeals affirmed the conviction and sentence.

Petitioner's competence was the focus of significant attention both before and during his trial. On five separate occasions a judge considered whether petitioner had the ability to understand the charges against him and to assist defense counsel. On the first occasion, a pretrial judge relied on the opinion of a clinical psychologist employed by the State to find petitioner incompetent. Based on that determination, he committed petitioner to a state mental health facility for treatment.

Assistant Attorney General, and *Carol Clawson,* Solicitor General, *John M. Bailey,* Chief State's Attorney of Connecticut, and by the Attorneys General for their respective States as follows: *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Michael C. Moore* of Mississippi, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Tom Udall* of New Mexico, *Betty D. Montgomery* of Ohio, *Thomas W. Corbett, Jr.,* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, and *James S. Gilmore III* of Virginia.

Upon petitioner's release from the hospital some three months later, the trial judge heard testimony concerning petitioner's competence from two state-employed psychologists. These experts expressed conflicting opinions regarding petitioner's ability to participate in his defense. The judge resolved the dispute against petitioner, ordering him to proceed to trial.

At the close of a pretrial hearing held one week before the trial was scheduled to begin, the lead defense attorney raised the issue of petitioner's competence for a third time. Counsel advised the court that petitioner was behaving oddly and refusing to communicate with him. Defense counsel opined that it would be a serious matter "if he's not faking." App. 6. After listening to counsel's concerns, however, the judge declined to revisit his earlier determination that petitioner was competent to stand trial.

Petitioner's competence was addressed a fourth time on the first day of trial, when petitioner's bizarre behavior prompted the court to conduct a further competency hearing at which the judge observed petitioner and heard testimony from several lay witnesses, a third psychologist, and petitioner himself.[1] The expert concluded that petitioner was

---

[1] During the hearing petitioner, who had refused to change out of prison overalls for the trial because the proffered clothes were "burning" him, Tr. of Pretrial Motions and Competency Hearings 3–4 (May 4–5, 1992), talked to himself and to an imaginary "spirit" who petitioner claimed gave him counsel. On the witness stand petitioner expressed fear that the lead defense attorney wanted to kill him.

In his argument at the close of the proceeding, defense counsel reminded the court of an incident that occurred during petitioner's testimony:

"Every time I would get close to his space where he is seated in this little witness enclave . . . he would stand up and he would get away from me as far as he could and so I would back off and I'd give him a little space. . . . So, I've approached him from every side. . . . except I haven't approached him from the front. So yesterday, I approach him from the front. And that's the last thing I did. I regret doing that.

"He stood up and he got as far back against the rail behind the witness chair as he could get. I edged closer. He got as far back and he got up

presently incompetent and unable to communicate effectively with counsel, but that he could probably achieve competence within six weeks if treated aggressively. While stating that he did not dispute the psychologist's diagnosis, the trial judge ruled against petitioner. In so holding, however, the court voiced uncertainty:

> "Well, I think I've used the expression . . . in the past that normal is like us. Anybody that's not like us is not normal, so I don't think normal is a proper definition that we are to use with incompetence. My shirtsleeve opinion of Mr. Cooper is that he's not normal. Now, to say he's not competent is something else.
>
> .      .      .      .      .
>
> "But you know, all things considered, I suppose it's possible for a client to be in such a predicament that he can't help his defense and still not be incompetent. I suppose that's a possibility, too.
>
> "I think it's going to take smarter people than me to make a decision here. I'm going to say that I don't believe he has carried the burden by clear and convincing evidence of his incompetency and I'm going to say we're going to go to trial." *Id.,* at 42–43.

---

on that rail. So I've got him up on the rail and I'm thinking, hey, what can I lose? Let me just see what he does now because he can go no further back, but as the Court knows, there's a space of about two-and-a-half feet behind this rail and a marble wall.

"Without looking for his safety at all and looking what's behind him, when I moved the least bit and I didn't move very far towards him, he fell to get away from me. He fell. He hit his head. The thud on that marble when he jackknifed backward off of that railing into that marble could be heard at the back of that courtroom. . . .

"We got him back up here in the witness enclave, he's just busted his head, tears are streaming down his eyes and he does not respond in any normal fashion." App. 37–38.

Incidents that occurred during the trial,[2] as well as the sordid history of petitioner's childhood that was recounted during the sentencing phase of the proceeding, were consistent with the conclusions expressed by the expert. In a final effort to protect his client's interests, defense counsel moved for a mistrial or a renewed investigation into petitioner's competence. After the court summarily denied these motions, petitioner was convicted and sentenced to death.

In the Court of Criminal Appeals, petitioner contended that Oklahoma's presumption of competence, combined with its statutory requirement that a criminal defendant establish incompetence by clear and convincing evidence, Okla. Stat., Tit. 22, § 1175.4(B) (1991),[3] placed such an onerous burden on him as to violate his right to due process of law. The appellate court rejected this argument. After noting that it can be difficult to determine whether a defendant is malingering, given "the inexactness and uncertainty attached to [competency] proceedings," the court held that the standard was justified because the "State has great interest in assuring its citizens a thorough and speedy judicial process," and because a "truly incompetent criminal defendant, through his attorneys and experts, can prove incompetency with relative ease." 889 P. 2d 293, 303 (1995). We granted certiorari to review the Court of Criminal Appeals' conclusion that appli-

---

[2] Petitioner did not communicate with or sit near defense counsel during the trial. Through much of the proceedings he remained in prison overalls, crouching in the fetal position and talking to himself.

[3] Section 1175.4(B) provides, in relevant part: "The court, at the hearing on the application [for determination of competency], shall determine, by clear and convincing evidence, if the person is incompetent. The person shall be presumed to be competent for the purposes of the allocation of the burden of proof and burden of going forward with the evidence."

Section 1175.4 was amended in 1991, during the pretrial period of petitioner's prosecution. The amendment did not alter the text of subsection B.

cation of the clear and convincing evidence standard does not violate due process. 516 U. S. 910 (1995).

## II

No one questions the existence of the fundamental right that petitioner invokes. We have repeatedly and consistently recognized that "the criminal trial of an incompetent defendant violates due process." *Medina* v. *California,* 505 U. S. 437, 453 (1992); *Drope* v. *Missouri,* 420 U. S. 162, 171–172 (1975); *Pate* v. *Robinson,* 383 U. S. 375, 378 (1966). Nor is the significance of this right open to dispute. As JUSTICE KENNEDY recently emphasized:

> "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so. *Drope* v. *Missouri,* 420 U. S. 162, 171–172 (1975)." *Riggins* v. *Nevada,* 504 U. S. 127, 139–140 (1992) (opinion concurring in judgment).[4]

The test for incompetence is also well settled. A defendant may not be put to trial unless he "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.'" *Dusky* v. *United States,* 362 U. S. 402, 402 (1960) *(per curiam).*[5]

---

[4] Indeed, the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination. See *Pate* v. *Robinson,* 383 U. S. 375, 384 (1966).

[5] The Oklahoma statute defines competence as "the present ability of a person arrested for or charged with a crime to understand the nature of the charges and proceedings brought against him and to effectively and

Our recent decision in *Medina* v. *California*, 505 U. S. 437 (1992), establishes that a State may presume that the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence. *Id.*, at 449. In reaching that conclusion we held that the relevant inquiry was whether the presumption "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.*, at 445 (quoting *Patterson* v. *New York*, 432 U. S. 197, 202 (1977)). We contrasted the "deep roots in our common-law heritage" underlying the prohibition against trying the incompetent with the absence of any settled tradition concerning the allocation of the burden of proof in a competency proceeding. 505 U. S., at 446. Our conclusion that the presumption of competence offends no recognized principle of "fundamental fairness" rested in part on the fact that the procedural rule affects the outcome "only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Id.*, at 449.[6]

The question we address today is quite different from the question posed in *Medina*. Petitioner's claim requires us to consider whether a State may proceed with a criminal trial after the defendant has demonstrated that he is more likely than not incompetent. Oklahoma does not contend that it may require the defendant to prove incompetence beyond a reasonable doubt.[7] The State maintains, however, that the clear and convincing standard provides a reasonable accom-

---

rationally assist in his defense." Okla. Stat., Tit. 22, § 1175.1(1) (Supp. 1996).

[6] In her concurring opinion, JUSTICE O'CONNOR expressed the view that placing the burden on the defendant in this limited group of cases was permissible because it provided the defendant with an incentive to cooperate with the information-gathering process necessary to a reliable competency determination. *Medina*, 505 U. S., at 455.

[7] Tr. of Oral Arg. 46–48.

modation of the opposing interests of the State and the defendant. We are persuaded, by both traditional and modern practice and the importance of the constitutional interest at stake, that the State's argument must be rejected.

### III

"Historical practice is probative of whether a procedural rule can be characterized as fundamental," *Medina*, 505 U. S., at 446. In this case, unlike in *Medina*, there is no indication that the rule Oklahoma seeks to defend has any roots in prior practice. Indeed, it appears that a rule significantly more favorable to the defendant has had a long and consistent application.

We turn first to an examination of the relevant common-law traditions of England and this country. The prohibition against trying the incompetent defendant was well established by the time Hale and Blackstone wrote their famous commentaries. 4 W. Blackstone, Commentaries *24 ("[I]f a man in his sound memory commits a capital offence . . . [a]nd if, after he has pleaded, the prisoner becomes mad, he shall not be tried: for how can he make his defence?"); 1 M. Hale, Pleas of the Crown *34–*35 (same). The English cases which predate our Constitution provide no guidance, however, concerning the applicable standard of proof in competency determinations. See *Trial of Charles Bateman* (1685), reported in 11 How. St. Tr. 464, 467 (1816), and Hawles, *Remarks on the Trial of Mr. Charles Bateman*, 11 How. St. Tr. 474, 476 (1816) (noting that the court in the 1685 trial incurred "censure" for proceeding to trial with a doubt as to the defendant's competence); *Kinloch's Case* (1746), 18 How. St. Tr. 395, 411 (1813); *King* v. *Steel*, 1 Leach 452, 168 Eng. Rep. 328 (1787).

Beginning in the late 18th century, cases appear which provide an inkling of the proper standard. In *King* v. *Frith*, 22 How. St. Tr. 307 (1790), for example, the court instructed

the jury to "diligently inquire . . . whether John Frith, the now prisoner at the bar . . . be of sound mind and understanding or not . . . ." *Id.*, at 311. Some 50 years later the jurors received a nearly identical admonition in *Queen* v. *Goode*, 7 Ad. & E. 536, 112 Eng. Rep. 572 (K. B. 1837): " 'You shall diligently inquire, and true presentment make . . . whether John Goode . . . be insane or not . . . .' " *Id.*, at 536, n. *(a)*, 112 Eng. Rep., at 572–573, n. *(a)*2.[8] Similarly, in *King* v. *Pritchard*, 7 Car. & P. 303, 173 Eng. Rep. 135 (1836), the court empaneled a jury to consider "whether the prisoner is mute of malice or not; secondly, whether he can plead to the indictment or not; thirdly, whether he is of sufficient intellect to comprehend the course of proceedings on the trial . . . ." *Ibid.* See also *King* v. *Dyson*, 73 Car. & P. 305, n. *(a)*, 173 Eng. Rep. 135–136, n. *(a)* (1831); *Queen* v. *Southey*, 4 F. & F. 864, 895, 176 Eng. Rep. 825, 838 (1865); *Queen* v. *Berry*, 1 Q. B. Rep. 447, 449 (1876). *Ibid.*[9]

These authorities, while still speaking less clearly than we might wish, are instructive. By phrasing the inquiry in a simple disjunctive, *Frith, Goode,* and *Pritchard* suggest that traditional practice required the jury to determine whether the defendant was "more likely than not" incompetent. Nothing in the jury instructions of these cases will bear the interpretation of a clear and convincing standard. What is more, the cases contain no indication that the use of a pre-

---

[8] Courts often referred to the prisoner's insanity (or present insanity) rather than incompetence, even when the proceeding concerned the defendant's competence to stand trial. Beginning with the earliest cases, the issue at a sanity or competency hearing has been "whether the prisoner has sufficient understanding to comprehend the nature of this trial, so as to make a proper defence to the charge." *King* v. *Pritchard*, 7 Car. & P. 303, 304, 173 Eng. Rep. 135 (1836).

[9] In 1800 England codified the common-law rule that a court could empanel a jury to determine whether a defendant charged with treason, murder, or a felony offense was competent to stand trial. Criminal Lunatics Act, 1800, 39 & 40, Geo. 3, ch. 94, § 2.

ponderance standard represented a departure from earlier (pre-Constitution) practice.[10]

Modern English authority confirms our interpretation of these early cases as applying a preponderance standard. Relying on "principles . . . laid down in a number of cases," including *Pritchard* and *King* v. *Dyson*, 7 Car. & P. 305, n. *(a)*, 173 Eng. Rep. 135, n. *(a)* (1831), the court in *Queen* v. *Podola*, 43 Crim. App. 220, 3 All E. R. 418 (1959), ruled:

> "If the contention that the accused is insane is put forward by the defence and contested by the prosecution, there is, in our judgment, a burden upon the defence of satisfying the jury of the accused's insanity. In such a case, as in other criminal cases in which the onus of proof rests upon the defence, the onus is discharged if the jury are satisfied on the balance of probabilities that the accused's insanity has been made out." *Id.*, at 235, 3 All E. R., at 429.[11]

---

[10] Indeed, although in *Medina* we concluded that it is permissible for a State to require the defendant to shoulder the burden of demonstrating his incompetence, we noted that some 19th-century English authorities placed the burden on the prosecutor once competence was put in issue. *Medina* v. *California*, 505 U. S., at 447. See *Queen* v. *Davies*, 3 Car. & K. 328, 329, 175 Eng. Rep. 575, 575 (1853) (judge ruled that "[the prosecutor] should begin, and call his witnesses, to show that the prisoner is sane, and capable of pleading"); *Ley's Case*, 1 Lewin 239, 240, 168 Eng. Rep. 1026 (1828) (" 'If there be a doubt as to the prisoner's sanity . . . you cannot say that he is in a fit state to be put upon his trial' "). See also Halsbury, 10 Laws of England 403 (3d ed. 1955) ("Where a jury is so empanelled [to determine competency], the onus is on the prosecution to prove the sanity of the defendant"). But see *Queen* v. *Podola*, 43 Crim. App. 220, 236, 3 All E. R. 418, 430 (1959) (explicitly rejecting the suggestion that the prosecutor must prove the defendant's competence to stand trial). Given the disagreement among English courts concerning which party bore the burden of proof, it is unlikely that in cases in which the burden was placed on the defendant that burden was as weighty as clear and convincing evidence.

[11] The *Podola* court opined that the tests laid down in *Pritchard* "have been followed so often that they may be said to be firmly embodied in our law." 43 Crim. App., at 238, 3 All E. R., at 431.

Likewise, we are aware of no decisional law from this country suggesting that any State employed Oklahoma's heightened standard until quite recently. Rather, the earliest available sources typically refer to English authorities, see, *e. g., Freeman* v. *People,* 47 Am. Dec. 216, 223–225 (N. Y. 1847), *State* v. *Harris,* 78 Am. Dec. 272, 272–275 (N. C. 1860) (adopting procedures outlined in *King* v. *Dyson,* 7 Car. & P. 305, n. *(a),* 173 Eng. Rep. 135, n. *(a)* (1831), and *King* v. *Pritchard,* 7 Car. & P. 303, 173 Eng. Rep. 135 (1836)), and employ the disjunctive language used by the English courts, see, *e. g., Commonwealth* v. *Hathaway,* 13 Mass. 299 (1816); *People* v. *Kleim,* 1 N. Y. 13, 15 (1845); *Harris,* 78 Am. Dec., at 275; *United States* v. *Chisolm,* 149 F. 284, 290 (SD Ala. 1906).[12] By the turn of the 20th century, however, American courts were explicitly applying a preponderance standard. In 1896, Ohio juries were instructed that "[t]he burden is upon the prisoner to show by a preponderance of the proof that he is insane." *State* v. *O'Grady,* 5 Ohio Dec. 654, 655 (1896).[13] Some 15 years later, the Tennessee Supreme Court described the competency determination as

---

[12] In *Commonwealth* v. *Braley,* 1 Mass. 102, 103 (1804), a case decided shortly after the Constitution was ratified, the court instructed the jury to consider "whether [the accused] neglected or refused to plead to the indictment against him for murder, of his free will and malice, or whether he did so neglect by the act of God." This instruction may be a precursor to the "sane or insane" disjunctive.

[13] See also *State* v. *Tyler,* 7 Ohio N. P. 443, 444 (1898) ("What I mean by the preponderance of the evidence is that the accused must show that he is now at the time of this trial probably not sane"). Cf. *People* v. *Ah Ying,* 42 Cal. 18, 20 (1872) (jury should find defendant presently insane if "satisfied" by the evidence supporting that conclusion).

Both *Tyler* and *State* v. *O'Grady* are instructive concerning the proper interpretation of the authorities which articulate no standard of proof but phrase the inquiry in the disjunctive. In each case the jury was told that its task was to determine whether the accused "is or is not sane," *Tyler,* 7 Ohio N. P., at 443, see also *O'Grady,* 5 Ohio Dec., at 654, and then explicitly instructed that the defendant bore the burden of proof by a preponderance of the evidence. *Tyler,* 7 Ohio N. P., at 443; *O'Grady,* 5 Ohio Dec., at 655.

"controlled by the preponderance of the proof," *Jordan* v. *State*, 124 Tenn. 81, 89, 135 S. W. 327, 329 (1911), and the highest court of Pennsylvania held that competence is "decided by a preponderance of the evidence," *Commonwealth* v. *Simanowicz*, 242 Pa. 402, 405, 89 A. 562, 563 (1913).[14] These early authorities are bereft of language susceptible of supporting a clear and convincing evidence standard.[15]

Contemporary practice demonstrates that the vast majority of jurisdictions remain persuaded that the heightened standard of proof imposed on the accused in Oklahoma is not necessary to vindicate the State's interest in prompt and orderly disposition of criminal cases. Only 4 of the 50 States presently require the criminal defendant to prove his incompetence by clear and convincing evidence.[16] None of the re-

---

[14] See also *State* v. *Arnold*, 12 Iowa 479, 484 (1861) ("A doubt must be raised whether at the time there is such mental impairment . . . as to render it probable that the prisoner can not, as far as may devolve upon him, have a full, fair and impartial trial"); *People* v. *McElvaine*, 125 N. Y. 596, 608, 26 N. E. 929, 933 (1891) (the court "was familiar with the appearance and conduct of the prisoner during the period of that trial, and had sufficient grounds before it to judge as to the probability of his present sanity"). See also *Crocker* v. *State*, 19 N. W. 435, 436 (Wis. 1884); *United States* v. *Chisolm*, 149 F. 284, 290 (SD Ala. 1906).

Several of the early cases explicitly mention the common-law roots of the State's statutory procedure for determining competency. See *People* v. *McElvaine*, 125 N. Y., at 608, 26 N. E., at 932 ("We do not think the Code of Criminal Procedure has made any radical change in the mode of procedure or the character of the [competency] proceedings"); *French* v. *State*, 67 N. W. 706, 710 (Wis. 1896) ("The statute . . . providing for an inquisition, where there is a probability that the accused is, at the time of his trial, insane, and thereby incapacitated to act for himself, to determine whether he is so insane, is substantially a provision in affirmance of a power the court had at common law in such cases, as abundantly appears from the authorities").

[15] Oklahoma all but concedes that early common law and statutory decisions employed a standard of proof lower than clear and convincing. See Brief for Respondent 21–23.

[16] Conn. Gen. Stat. §54–56d(b) (1995); Okla. Stat., Tit. 22, §1175.4 (1991); 50 Pa. Cons. Stat. §7403(a) (Supp. 1995); and R. I. Gen. Laws §40.1–5.3–3 (Supp. 1995). The adoption of the clear and convincing evidence standard

maining 46 jurisdictions imposes such a heavy burden on the defendant.[17]    Indeed, a number of States place no burden on the defendant at all, but rather require the prosecutor to

by Oklahoma and Connecticut may have been a response to this Court's decision in *Addington* v. *Texas*, 441 U. S. 418 (1979).    We discuss *Addington infra*, at 368–369.

[17] See *Lackey* v. *State*, 615 So. 2d 145, 151–152 (Ala. Crim. App. 1992); *McCarlo* v. *State*, 677 P. 2d 1268, 1272 (Alaska App. 1984); Cal. Penal Code Ann. § 1369(f) (West 1982); Colo. Rev. Stat. § 16–8–111(2) (1986); *Diaz* v. *State*, 508 A. 2d 861, 863 (Del. 1986); *Flowers* v. *State*, 353 So. 2d 1259, 1270 (Fla. App. 1978); *Johnson* v. *State*, 209 Ga. App. 514, 516, 433 S. E. 2d 717, 719 (1993); Haw. Rev. Stat. §§ 704–404 and 704–411 (1993); Ill. Comp. Stat., ch. 725, § 5/104–11(c) (1992); *Montano* v. *State*, 649 N. E. 2d 1053, 1057–1058 (Ind. App. 1995); *State* v. *Rhode*, 503 N. W. 2d 27, 35 (Iowa App. 1993); *State* v. *Seminary*, 165 La. 67, 72, 115 So. 370, 372 (1927); *Jolley* v. *State*, 282 Md. 353, 365, 384 A. 2d 91, 98 (1978); *Commonwealth* v. *Prater*, 420 Mass. 569, 573–574, 651 N. E. 2d 833, 837 (1995); Minn. Rule Crim. Proc. 20.01 (1995); *Griffin* v. *State*, 504 So. 2d 186, 191 (Miss. 1987); *State* v. *Zorzy*, 136 N. H. 710, 714–715, 622 A. 2d 1217, 1219 (1993); *State* v. *Lambert*, 275 N. J. Super. 125, 129, 645 A. 2d 1189, 1191 (1994); *State* v. *Chapman*, 104 N. M. 324, 327, 721 P. 2d 392, 395 (1986); *People* v. *Santos*, 43 App. Div. 2d 73, 75, 349 N. Y. S. 2d 439, 442 (1973); *State* v. *Heger*, 326 N. W. 2d 855, 858 (N. D. 1982); Ohio Rev. Code Ann. § 2945.37 (1993); *State* v. *Nance*, 466 S. E. 2d 349, 351 (S. C. 1996); S. D. Codified Laws § 23A–10A–6.1 (1988); *Jordan* v. *State*, 124 Tenn. 81, 89, 135 S. W. 327, 329 (1911); *Blacklock* v. *State*, 820 S. W. 2d 882, 886 (Tex. App. 1991); Utah Code Ann. § 77–15–5(10) (1995); Va. Code Ann. § 19.2–169.1(E) (1995); Wash. Rev. Code § 10.77.090 (1994); W. Va. Code § 27–6A–2(b) (1992); Wis. Stat. § 971.14(4)(b) (1985 and Supp. 1995); *Loomer* v. *State*, 768 P. 2d 1042, 1045 (Wyo. 1989).

The burden imposed in the remaining States is unclear.    Nothing in the competency statutes or case law of these States suggests, however, that the defendant bears the burden of proving incompetence by clear and convincing evidence.    See Ariz. Rule Crim. Proc. 11.5 (1987 and Supp. 1995); *Mitchell* v. *State*, 323 Ark. 116, 120, 913 S. W. 2d 264, 266 (1996); Idaho Code § 18–212 (1987); Kan. Stat. Ann. § 22–3302 (1995); Ky. Rev. Stat. Ann. § 504.100 (Michie 1990); Me. Rev. Stat. Ann., Tit. 15, § 101–B (Supp. 1995); Mich. Comp. Laws § 330.2020 (1992); *State* v. *Clark*, 546 S. W. 2d 455, 468 (Mo. App. 1976); Mont. Code Ann. § 46–14–221 (1992 and Supp. 1995); Neb. Rev. Stat. § 29–1823 (1989); Nev. Rev. Stat. § 178.415 (1992); N. C. Gen. Stat. § 15A–1002 (1988); Ore. Rev. Stat. §§ 161.360–161.370 (Supp. 1994); and Vt. Stat. Ann., Tit. 13, § 4817 (1974).

prove the defendant's competence to stand trial once a question about competency has been credibly raised.[18]   The situation is no different in federal court.   Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.   18 U. S. C. § 4241.

The near-uniform application of a standard that is more protective of the defendant's rights than Oklahoma's clear and convincing evidence rule supports our conclusion that the heightened standard offends a principle of justice that is deeply "rooted in the traditions and conscience of our people."   *Medina* v. *California*, 505 U. S., at 445 (internal quotation marks omitted).   We turn next to a consideration of whether the rule exhibits "'fundamental fairness' in operation."   *Id.*, at 448 (quoting *Dowling* v. *United States*, 493 U. S. 342, 352 (1990)).

## IV

Contemporary and historical procedures are fully consistent with our evaluation of the risks inherent in Oklahoma's practice of requiring the defendant to prove incompetence by clear and convincing evidence.   In *Addington* v. *Texas*, 441 U. S. 418, 423 (1979), we explained that:

> "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *In re Winship*, 397 U. S. 358, 370 (1970) (Harlan, J., concurring)."

The "more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision."

---

[18] See, *e. g.*, Haw. Rev. Stat. §§ 704–404 and 704–411 (1993); Ill. Comp. Stat., ch. 725, § 5/104–11(c) (1992); S. D. Codified Laws § 23A–10A–6.1 (1988); Wis. Stat. § 971.14(4)(b) (Supp. 1994 and Supp. II 1995).

*Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261, 283 (1990). For that reason, we have held that due process places a heightened burden of proof on the State in civil proceedings in which the "individual interests at stake . . . are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky* v. *Kramer,* 455 U. S. 745, 756 (1982) (termination of parental rights) (quoting *Addington,* 441 U. S., at 424).[19]

Far from "jealously guard[ing]," *Jacob* v. *New York City,* 315 U. S. 752, 752–753 (1942), an incompetent criminal defendant's fundamental right not to stand trial, Oklahoma's practice of requiring the defendant to prove incompetence by clear and convincing evidence imposes a significant risk of an erroneous determination that the defendant is competent. In *Medina* we found no comparable risk because the presumption would affect only the narrow class of cases in which the evidence on either side was equally balanced.

---

[19] See also *Addington* v. *Texas* (involuntary civil commitment); *Woodby* v. *INS,* 385 U. S. 276, 285–286 (1966) (deportation); *Chaunt* v. *United States,* 364 U. S. 350, 353 (1960) (denaturalization); *Schneiderman* v. *United States,* 320 U. S. 118, 125 (1943) (denaturalization).

Our opinions in *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261 (1990), and *Ohio* v. *Akron Center for Reproductive Health,* 497 U. S. 502 (1990), are not to the contrary. In *Cruzan* we held that the Due Process Clause does not prohibit Missouri from requiring a third party who seeks to terminate life-sustaining treatment to demonstrate by clear and convincing evidence that the incompetent person receiving such treatment would wish that step to be taken. 497 U. S., at 280. We reasoned that the heightened standard of proof was permissible because the decisionmaker was a surrogate for the incompetent individual, *id.,* at 280–281, and because the consequences of an erroneous decision were irreversible, *id.,* at 283. In *Akron Center for Reproductive Health* we upheld an Ohio statute that required an unmarried, unemancipated minor woman who sought to obtain an abortion without notifying a parent to prove by clear and convincing evidence that judicial bypass of the notification requirement was appropriate in her case. We approved the heightened standard of proof in that case largely because the proceeding at issue was *ex parte.* 497 U. S., at 515–516.

"Once a State provides a defendant access to procedures for making a competency evaluation," we stated, there is "no basis for holding that due process further requires the State to assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that the defendant is competent to stand trial." 505 U. S., at 449. Unlike the presumption at issue in *Medina*, however, Oklahoma's clear and convincing evidence standard affects a class of cases in which the defendant has already demonstrated that he is more likely than not incompetent.

For the defendant, the consequences of an erroneous determination of competence are dire. Because he lacks the ability to communicate effectively with counsel, he may be unable to exercise other "rights deemed essential to a fair trial." *Riggins* v. *Nevada*, 504 U. S., at 139 (KENNEDY, J., concurring in judgment). After making the "profound" choice whether to plead guilty, *Godinez* v. *Moran*, 509 U. S. 389, 398 (1993), the defendant who proceeds to trial

> "will ordinarily have to decide whether to waive his 'privilege against compulsory self-incrimination,' *Boykin* v. *Alabama*, 395 U. S. 238, 243 (1969), by taking the witness stand; if the option is available, he may have to decide whether to waive his 'right to trial by jury,' *ibid.;* and, in consultation with counsel, he may have to decide whether to waive his 'right to confront [his] accusers,' *ibid.*, by declining to cross-examine witnesses for the prosecution." *Ibid.*

With the assistance of counsel, the defendant also is called upon to make myriad smaller decisions concerning the course of his defense. The importance of these rights and decisions demonstrates that an erroneous determination of competence threatens a "fundamental component of our criminal justice system"[20]—the basic fairness of the trial itself.

---

[20] *United States* v. *Cronic*, 466 U. S. 648, 653 (1984).

By comparison to the defendant's interest, the injury to the State of the opposite error—a conclusion that the defendant is incompetent when he is in fact malingering—is modest. To be sure, such an error imposes an expense on the state treasury and frustrates the State's interest in the prompt disposition of criminal charges. But the error is subject to correction in a subsequent proceeding and the State may detain the incompetent defendant for "the reasonable period of time necessary to determine whether there is a substantial probability that he will attain [competence] in the foreseeable future." *Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972).[21]

The Oklahoma Court of Criminal Appeals correctly observed that the "inexactness and uncertainty" that characterize competency proceedings may make it difficult to determine whether a defendant is incompetent or malingering. 889 P. 2d, at 303. We presume, however, that it is unusual for even the most artful malingerer to feign incompetence successfully for a period of time while under professional care.[22] In this regard it is worth reiterating that only four jurisdictions currently consider it necessary to impose on the criminal defendant the burden of proving incompetence by clear and convincing evidence. Moreover, there is no reason to believe that the art of dissimilation is new. Eighteenth and nineteenth century courts, for example, warned jurors charged with making competency determinations that "'there may be great fraud in this matter,'" *King* v. *Dyson*, 7 Car. & P. 305, n. *(a)*, 173 Eng. Rep., at 136, n. *(a)* (quoting

---

[21] Under *Jackson*, if the defendant regains competence or is found to be malingering, the State may proceed to trial.

[22] Sir John Hawles, Solicitor General to King William III (who reigned from 1689–1702), noted that "there is a great difference between pretences and realities, and *sana* and *non sana memoria* hath been often tryed in capital matters, and the prisoners have reaped so little benefit by their pretences, it being always discovered, that we rarely hear of it." Hawles, *Remarks on the Trial of Mr. Charles Bateman* (1685), 11 How. St. Tr. 474, 478 (1816).

1 Hale, Pleas of the Crown, at \*35), and that "[i]t would be a reproach to justice if a guilty man . . . postponed his trial upon a feigned condition of mind, as to his inability to aid in his defense," *United States* v. *Chisolm*, 149 F., at 288.[23] Although they recognized this risk, the early authorities did not resort to a heightened burden of proof in competency proceedings. See Part III, *supra.*

More fundamentally, while the difficulty of ascertaining where the truth lies may make it appropriate to place the burden of proof on the proponent of an issue, it does not justify the additional onus of an especially high standard of proof. As the *Chisolm* Court continued,

> "[I]t would be likewise a reproach to justice and our institutions, if a human being . . . were compelled to go to trial at a time when he is not sufficiently in possession of his mental faculties to enable him to make a rational and proper defense. The latter would be a more grievous error than the former; since in the one case an individual would go unwhipped of justice, while in the other the great safeguards which the law adopts in the punishment of crime and the upholding of justice would be rudely invaded by the tribunal whose sacred duty it is to uphold the law in all its integrity." 149 F., at 288.

A heightened standard does not decrease the risk of error, but simply reallocates that risk between the parties. See *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S., at 283. In cases in which competence is at issue, we perceive no sound basis for allocating to the criminal defendant the large share of the risk which accompanies a clear and convincing evidence standard. We assume that questions of competence will arise in a range of cases including not only those in which one side will prevail with relative ease, but also those in which it is more likely than not that the defendant

---

[23] See also *People* v. *Lake*, 2 N. Y. 215, 220, 222 (1855); *State* v. *Harris*, 78 Am. Dec. 272, 274 (N. C. 1860); *State* v. *Tyler*, 7 Ohio N. P., at 444.

is incompetent but the evidence is insufficiently strong to satisfy a clear and convincing standard. While important state interests are unquestionably at stake, in these latter cases the defendant's fundamental right to be tried only while competent outweighs the State's interest in the efficient operation of its criminal justice system.

## V

Oklahoma makes two additional arguments in support of its procedural rule that warrant discussion. First, Oklahoma correctly reminds us that it is normally within the power of the State to establish the procedures through which its laws are given effect, including those related to the burden of producing evidence and the burden of persuasion. See *Patterson* v. *New York*, 432 U. S., at 201–202. In *Patterson* we upheld New York's requirement that in a prosecution for second-degree murder the defendant must bear the burden of proving the affirmative defense of extreme emotional disturbance in order to reduce the crime to manslaughter. *Id.*, at 207–208. After observing that the rule was consistent with common-law practice, *id.*, at 202, we held that "[t]he Due Process Clause . . . does not put New York to the choice of abandoning [statutory] defenses or undertaking to disprove their existence in order to convict of a crime which otherwise is within its constitutional powers to sanction by substantial punishment," *id.*, at 207–208.

Although we found no violation in *Patterson*, we noted that the State's power to regulate procedural burdens was subject to proscription under the Due Process Clause if it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," *id.*, at 201–202 (internal quotation marks omitted). This case involves such a rule. Unlike *Patterson*, which concerned procedures for proving a statutory defense, we consider here whether a State's procedures for guaranteeing a fundamental constitutional right are sufficiently protective

of that right. The deep roots and fundamental character of the defendant's right not to stand trial when it is more likely than not that he lacks the capacity to understand the nature of the proceedings against him or to communicate effectively with counsel mandate constitutional protection.

Finally, Oklahoma suggests that our decision in *Addington v. Texas*, 441 U. S. 418 (1979), in which we held that due process requires a clear and convincing standard of proof in an involuntary civil commitment proceeding, supports imposition of such a rule in competency proceedings. The argument is unpersuasive because commitment and competency proceedings address entirely different substantive issues. Although we have not had the opportunity to consider the outer limits of a State's authority to civilly commit an unwilling individual, *O'Connor v. Donaldson*, 422 U. S. 563, 573–574 (1975), our decision in *Donaldson* makes clear that due process requires at a minimum a showing that the person is mentally ill and either poses a danger to himself or others or is incapable of "surviving safely in freedom," *id.*, at 573–576. The test for competence to stand trial, by contrast, is whether the defendant has the present ability to understand the charges against him and communicate effectively with defense counsel. *Dusky v. United States*, 362 U. S., at 402. Even if we were to uphold Oklahoma's imposition of the clear and convincing evidence rule in competency proceedings, the comparable standards in the two proceedings would not guarantee parallel results.[24]

More importantly, our decision today is in complete accord with the basis for our ruling in *Addington*. Both cases concern the proper protection of fundamental rights in circumstances in which the State proposes to take drastic action against an individual. The requirement that the grounds for civil commitment be shown by clear and convincing evidence

---

[24] For example, a mentally retarded defendant accused of a nonviolent crime may be found incompetent to stand trial but not necessarily be subject to involuntary civil commitment.

protects the individual's fundamental interest in liberty. The *prohibition* against requiring the criminal defendant to demonstrate incompetence by clear and convincing evidence safeguards the fundamental right not to stand trial while incompetent. Because Oklahoma's procedural rule allows the State to put to trial a defendant who is more likely than not incompetent, the rule is incompatible with the dictates of due process.[25]

## VI

For the foregoing reasons, the judgment is reversed, and the case is remanded to the Oklahoma Court of Criminal Appeals for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[25] We note that *Addington* did not purport to resolve any question concerning the rights of the defendant in a criminal proceeding. To the contrary, in his opinion for the Court, Chief Justice Burger contrasted the appropriate standard in civil commitment proceedings with the rules applicable in criminal cases in which "the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." 441 U. S., at 423.