UNITED STATES of America,

v.

Annual David RUDISILL, Defendant.

No. Crim.A. 95–0302(SS).

United States District Court,
District of Columbia.

March 16, 1999.

James W. Rudasill, Jr., Washington, DC, for Anual David Rudisill, defendant.

Ronald L. Walutes, Jr., U.S. Attorney's Office, Civil Div., Washington, DC, for U.S.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on the issue of Defendant Anual Rudisill's competency to stand trial. On November 16, 1995, Rudisill was charged on a three count indictment for violation of 18 U.S.C. §§ 1951(a), 924(c), 922(g), and 924(e), based on his arrest on October 20, 1995, as one of three suspects in the armed robbery of a check cashing store. On October 27, 1995, Rudisill was ordered committed to the custody of the Attorney General for pretrial detention, and was incarcerated at the Central Detention Facility of the D.C. Department of Corrections pending further proceedings.

On October 31, 1995, while incarcerated at the D.C. jail, Rudisill was brutally attacked by eight other inmates. He sustained gross head and facial trauma, in-

cluding a retro bulbar hematoma, six fractures to the left frontal sinus, an orbital fracture, and brain swelling. Rudisill was admitted to D.C. General Hospital where he remained in a comatose state for approximately one month. On January 22, 1996, Rudisill was transferred to the National Rehabilitation Hospital's Brain Injury Unit, where he remained until the Court, on April 17, 1996, ordered his release to his mother's custody for continued medical care on an outpatient basis.

Based on Rudisill's injuries, the Court, in accordance with 18 U.S.C. §§ 4241(a), 4241(c), and 4247(d), held several hearings to determine whether Rudisill was competent to stand trial. By its Memorandum Opinion and Order dated April 28, 1998, the Court concluded that Rudisill had the mental capacity of a child of tender years and that by a preponderance of the evidence Rudisill was not mentally competent to stand trial at that time. On September 10, 1998, the Court committed Rudisill to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d) to determine whether there was a substantial probability that he would attain the mental capacity to stand trial in the foreseeable future.

Rudisill was admitted to the Federal Correctional Institution at Butner, North Carolina ("Butner"). He was evaluated over the course of approximately 30 days and then released on October 9, 1998 back to the custody of his mother. On October 16, 1998, Dr. Sally Johnson, acting warden at Butner, filed a Certificate of Restoration of Competency to Stand Trial. As reported in their Forensic Evaluation of Rudisill, Dr. Johnson and Dr. Edward Landis of Butner found that Rudisill suffered from mild neurocognitive disorder and some pre- and post-trauma amnesia but that he was, in their opinion, mentally competent to stand trial. Although Rudisill appeared confused on matters relating to his criminal charges, Drs. Johnson and Landis explained that Rudisill's confusion was actually evidence of malingering and

evasiveness and did not militate against their finding that Rudisill was mentally competent to stand trial.

On November 3, 1998, on the basis of the report by Drs. Johnson and Landis, the Government filed a Motion for Determination of the Defendant's Competency to Stand Trial Pursuant to 18 U.S.C. § 4241(e). In its motion, the Government stated that since Drs. Johnson and Landis concluded that Rudisill was found competent to stand trial, the only remaining issue was whether his pre- and post-trauma amnesia made him otherwise incompetent to stand trial. The Government contended that Rudisill's amnesia was not a sufficient legal basis to reverse the finding of mental competency.

On January 27, 1999, the Court ordered Rudisill to submit to additional medical and psychiatric evaluations because the Court faced conflicting evaluations. Dr. Roy Coleman, staff psychiatrist at St. Elizabeth's Hospital, had examined Rudisill on prior occasions. Earlier in these proceedings, he testified before the Court offering his opinion that Rudisill was not competent to stand trial.

Pursuant to court order, Rudisill was examined by Dr. William Garmoe of the National Rehabilitation Hospital ("NRH") on January 5, 13, and 14, 1999, by Dr. Andrew McCarthy of NRH on February 10, 1999, and again by Dr. Coleman on February 18, 1999. Dr. Garmoe found that Rudisill continues to exhibit severe cognitive impairment. He diagnosed Rudisill as suffering from dementia due to head trauma. Dr. McCarthy like Dr. Garmoe disputed the ultimate conclusions of Drs. Johnson and Landis. He diagnosed Rudisill as suffering from moderate to severe cognitive impairment.

Pursuant to 18 U.S.C. § 4241(e), on March 2, 1999, the Court held a hearing to determine whether Rudisill had the mental competency to stand trial and, if not, whether he would be mentally competent to stand trial in the foreseeable future. At

the hearing, the Court reviewed the written evaluations of Drs. Johnson and Landis, Garmoe, and McCarthy.[1] The Court heard the testimony of Dr. Coleman, Rudisill's mother Pearl Rudisill, and Rudisill. Dr. Coleman testified regarding his four separate examinations of Rudisill, conducted on July 11, 1996, December 5, 1996, February 12, 1998, and February 18, 1999, and stated that he did not find Rudisill competent to stand trial. Dr. Coleman concluded that Rudisill has severe cognitive impairment. He found only limited improvement between his February 12, 1998 and February 18, 1999 evaluations and contrary to Dr. Johnson he found no evidence of intentional exaggeration of symptoms. Dr. Coleman noted that Rudisill now has a different personality and no longer had the "violent" personality he had before his attack.

Dr. Coleman testified that Rudisill at trial would not be able to testify on his own behalf. He stated Rudisill could not understand the concept of a plea bargain, even though, to some degree, he could possibly understand the charges against him. Dr. Coleman concluded that it was unlikely that Rudisill would ever become mentally competent to stand trial.

Pearl Rudisill, who has served as Rudisill's custodian during his home confinement, testified regarding her son's daily activities. She said Rudisill could not drive an automobile. She stated he can pick out his clothes although they are not always coordinated. On a daily basis Rudisill watches television news and children's programs and reads portions of the newspaper. Mrs. Rudisill only permits her son to walk one block from the house alone.

The Court also interviewed Rudisill. It is obvious from his response to questions Rudisill clearly suffers from numerous speech and motor impairments. Rudisill had difficulty expressing himself and often resorted to symbols or hand gestures to aid him. Rudisill was able to explain that he knew he had been in prison although he did not know why and that he knows he used illegal drugs before but does not currently use them. He has absolutely no recollection of the facts underlying the charges against him.

It appears from the record that the remaining suspects in the underlying case have not been identified and therefore have not been brought to trial.

*Discussion*

The criminal trial of a mentally incompetent defendant is a violation of due process. *Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996). The defendant bears the burden of proof to demonstrate that he lacks the mental competency to stand trial and must do so by a preponderance of the evidence. *Cooper,* 517 U.S. at 362, 116 S.Ct. at 1380; 18 U.S.C. § 4241(d). The Court finds that Rudisill has met his burden and has proven that he is not competent to stand trial in this matter nor will he attain the capacity to become competent in the foreseeable future.

In *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), the Supreme Court set out the standard for determining a defendant's competency to stand trial as whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

Clearly this burden has been met. The Court concludes, on the testimony of Dr. Coleman, Mrs. Rudisill, and Rudisill, and on the basis of the evaluations by Dr. Garmoe and Dr. McCarthy, that Rudisill lacks the mental capacity to understand the criminal proceedings against him and

---

1. Dr. Johnson testified before the Court at an earlier date. Although she conceded at some point Rudisill was clearly not competent to stand trial, she believed that at the time of her examination he was competent to stand trial.

**4**

would be incapable of assisting his attorney in any meaningful manner in preparing his defense. The Court reaches this finding even though confronted by seemingly conflicting medical evaluations. Overall, the reports by all of the examining professionals are consistent in their findings that Rudisill has sustained neurocognitive deficiencies as a result of his injuries; they only differ in their conclusions as to the extent of damage. The Court is inclined to concur with the conclusions of Drs. Garmoe and McCarthy that Rudisill displays evidence of moderate to severe neurocognitive damage, which was corroborated by the expert testimony of Dr. Coleman, *see United States v. Caldwell,* 543 F.2d 1333, 1348 (D.C.Cir.1974), and by the testimony of Mrs. Rudisill and the Court's observations of Rudisill.[2]

That Dr. Johnson and Dr. Landis have concluded that Rudisill is competent to stand trial is not dispositive of the issue. This is particularly so because the Court rejects certain of their findings. Specifically, the Court finds little support for their finding that Rudisill was a malingerer. The Court has been able to observe Rudisill from early on in these proceedings. Drs. Johnson and Landis do not dispute that Rudisill was critically beaten in prison, that he was in a coma for some four weeks or that he has sustained permanent brain damage. They agree that at some point Rudisill was incompetent to stand trial. What Dr. Johnson could not tell the Court in her testimony was at what point did Rudisill become a "malingerer." Dr. Johnson was unable to convince the Court that Rudisill was dissembling by his inability to recall the events surrounding the charges against him. At no point in his numerous court appearances has Rudisill been able to recall those events. At no time has the Court ever entertained the thought that he was "malingering."

When the Court first observed Rudisill he was in an extremely poor physical and mental state. While over the years he has shown some improvement, he still exhibits mental deficits that demonstrate his incompetency to stand trial. Although Dr. Johnson in her report stated that Rudisill's memory might be aided by injection of sodium amytal, the court will not order such treatment. When a court has to resort to compelling a defendant to take "truth serum" in order to stand trial, we are coming very close to the denial of substantive "due process," an issue that this court does not believe it needs to reach in this proceeding. Dr. Johnson's finding of malingering is unsubstantiated.

■ The determination of competency remains with the Court, *see United States v. David,* 511 F.2d 355, 360 n. 9 (D.C.Cir. 1975), which is not limited solely to evaluating medical opinions in reaching its competency determination. It may rely on a variety of other factors including observation of the defendant's behavior. *See United States v. Nichols,* 56 F.3d 403, 411 (2d Cir.1995); *United States v. Hemsi,* 901 F.2d 293, 295–96 (2d Cir.1990).

■ Rudisill does not present a substantial risk of bodily harm to others or serious damage to the property of others that would warrant the return of his custody to the Government. *See* 18 U.S.C. §§ 4241(d), 4246(a). Although Rudisill appears to have once been a violent offender and suffered from drug addiction prior to his merciless beating, the Court finds that Rudisill is no longer violent, does not engage in illegal drug use, and appears to have benefitted from home confinement in the custody of his mother. By finding that Rudisill is not competent to stand trial and that he will not be a threat to others or their property, the Court will not recommit Rudisill to the custody of the Attorney

2. Because the Court concludes that Rudisill lacks the mental competency to stand trial and will not be able to do so in the foreseeable future, the Court need not address the

Government's arguments regarding competency to stand trial when a criminal defendant cannot recall the events underlying the charges but is otherwise mentally competent.

General. *See United States v. Wheeler,* 744 F.Supp. 633, 639–40 (E.D.Pa.1990).

 In discussing whether Rudisill should be permitted to recover at home even if he was found not competent to stand trial, the Government makes much of the point of the serious nature of the crime Rudisill is alleged to have committed and his past criminal conduct that has resulted in his incarceration of some 26 years. As Dr. Coleman testified, Rudisill is a much different person today than he was in his "anti social" years. He is a different person both physically and mentally. His physical and mental defects prevent him from living an existence by himself. He needs to be supervised in virtually all his daily chores. Indeed, it is difficult to conceive of a job he could perform for remuneration. To commit him to the custody of the Attorney General at the present time would neither serve the ends of justice or be fair to Rudisill. While the Government is certainly correct in pointing out Rudisill's prior criminal history, it must bear responsibility for his current state. The brutal attack on Rudisill by some eight fellow inmates while in pre-trial detention is something that should not have happened. When the Government takes custody of a pre-trial detainee, it must take all steps necessary to protect that person's physical well being. Clearly the Government failed in that responsibility.

The Court ordered Rudisill's pre-trial detention at which point he was brutally beaten. It will not at this time subject him to the same environment. It would be unjust for the Government to benefit from its failed responsibilities to protect Rudisill when he was in pre-trial custody. Since the Court has found it is unlikely that Rudisill will ever be competent to stand trial, a commitment to the custody of the Attorney General would, in effect, be a life sentence for Rudisill. Balancing the equities compels the Court to conclude that Rudisill should not be placed in the custody of the Attorney General for the rest of his life.